# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CRAIG T. BOUCHARD,        )
                                   )
        Plaintiff,          )
                                   )
        v.                  )    C.A. No. 2020-0097-KSJM
                                   )
BRAIDY INDUSTRIES, INC.,    )
JOHN PRESTON, CHARLES    )
PRICE, MICHAEL PORTER,    )
CHRISTOPHER SCHUH,       )
COMMONWEALTH SEED       )
CAPITAL, LLC, and HANNAH   )
MANAGEMENT LLC,         )
                                   )
        Defendants.     )

## MEMORANDUM OPINION

Date Submitted:  April 8, 2020
Date Decided:  April 28, 2020

Kevin R. Shannon, Christopher N. Kelly, Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Kahn A. Scolnick, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Lindsey S. Young, GIBSON, DUNN & CRUTCHER LLP, Palo Alto, California; *Counsel for Plaintiff Craig T. Bouchard.*

Richard P. Rollo, John T. Miraglia, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendants Braidy Industries, Inc., John Preston, Charles Price, Michael Porter, Christopher Schuh, and Hannah Management LLC.*

**McCORMICK, V.C.**

This lawsuit arises from a voting agreement among the stockholders of Braidy Industries, Inc. ("Braidy"). In relevant part, the voting agreement: grants the plaintiff, the founder of Braidy, the right to designate six "Founder Directors" to the Braidy board of directors; requires its signatories, upon the written request of the plaintiff, to vote or act by written consent to remove any Founder Director; and authorizes the corporate Secretary to serve as proxy for any stockholder who fails to act in accordance with the voting agreement. Years before this lawsuit, the plaintiff designated as Founder Directors himself and the four individual defendants, who are also stockholders and parties to the voting agreement.

In early 2020, the board removed the plaintiff from his positions as CEO, Chairman, and Secretary of Braidy. In response, the plaintiff demanded that the parties to the voting agreement, including the individual defendants, act by written consent to remove the individual defendants from the board. When they refused to comply, the plaintiff demanded that Braidy cause its Secretary to exercise his proxy to remove the individual defendants from the board. When Braidy also refused to comply, the plaintiff commenced this lawsuit to enforce the voting agreement. The plaintiff seeks specific performance and other relief.

All defendants except Braidy have moved to dismiss the complaint for lack of personal jurisdiction. One individual defendant also has moved to dismiss a claim asserted against him as corporate Secretary on the ground that it fails to state a claim

against him in that capacity. The plaintiff has moved for summary judgment on his claim for breach of the voting agreement and for judgment on the pleadings on Braidy's affirmative defense of unclean hands.

While the parties were briefing the motions, the Braidy board of directors took actions intended to change the board's composition. The voting agreement grants investors who acquire a threshold amount of common stock the right to designate additional board members, which the agreement defines as "Lead Investor Directors." The individual defendants caused the board to authorize a stock split intended to increase stock ownership levels to amounts that would entitle some stockholders to designate Lead Investor Directors. The board also expanded the number of board seats so that the six Founder Director positions constituted a minority of the board. The individual defendants then resigned as Founder Directors and, along with non-parties to the litigation, rejoined the board as Lead Investor Directors. The defendants argue that these actions mooted the plaintiff's request for specific performance of the voting agreement.

This decision traverses the gauntlet of motions raised by the parties. The defendants' motions to dismiss for lack of personal jurisdiction are granted. The plaintiff's motion for judgment on the pleadings as to Braidy's unclean hands defense is also granted. The plaintiff's motion for summary judgment is denied in its entirety to permit development of the factual record.

## I. FACTUAL BACKGROUND

The parties' various motions require the Court to view the facts through multiple lenses. In deciding a motion to dismiss pursuant to Rule 12(b)(2), the Court may "consider the pleadings, affidavits and any discovery of record."[1] In deciding a motion to dismiss pursuant to Rule 12(b)(6), the complaint and documents it incorporates by reference "generally define[] the universe of facts that the trial court may consider."[2] In deciding a motion for judgment on the pleadings pursuant to Rule 12(c), the Court may consider the pleadings and documents they incorporate by reference.[3] In deciding a motion for summary judgment pursuant to Rule 56, the Court may consider "the pleadings, depositions, answers to interrogatories and admissions on file," as well as supporting and opposing affidavits.[4]

### A. The Voting Agreement

In 2016, Plaintiff Craig Bouchard founded Braidy (or the "Company"), a Delaware corporation with principal places of business in Kentucky and Massachusetts whose purpose is to manufacture efficient and eco-friendly aluminum alloys. Bouchard served as CEO, Chairman of the board of directors (the "Board"),

---

[1] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citing *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[2] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (collecting cases).

[3] *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006).

[4] Ct. Ch. R. 56(c).

and Secretary. At the time this lawsuit was filed, the Board comprised Bouchard and Defendants John Preston, Charles Price, Michael Porter, and Christopher Schuh (the "Director Defendants"). Bouchard and each of the Director Defendants are also Braidy stockholders.

In 2018, the parties to this lawsuit entered into an Amended and Restated Voting Agreement (the "Voting Agreement").[5] Bouchard and the Director Defendants executed the Voting Agreement in their capacity as stockholders. The Board voted on and unanimously approved the Voting Agreement, which is governed by Delaware law.[6] The Voting Agreement is referenced throughout the Braidy bylaws, which state that "[o]nly persons who are nominated in accordance with" the Voting Agreement "shall be eligible for election as directors."[7]

Section 1.2 of the Voting Agreement governs Braidy's "Board Composition."[8] It provides that "[e]ach Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, . . . in whatever manner as shall be necessary" to elect the director

---

[5] C.A. No. 2020-0097-KSJM, Docket ("Dkt.") 44, Aff. of Craig T. Bouchard in Supp. of Pl.'s Mot. for Summ. J., Mot. for J. on the Pleadings, and Opp'n to Moving Defs.' Mot. to Dismiss ("Bouchard Aff.") Ex. A.

[6] *Id.* § 10.7.

[7] Dkt. 1, Verified Compl. ("Compl.") Ex. C § 2.1(f).

[8] Voting Agreement § 1.2

4

designees of certain stockholders to the Board.[9] Section 1.2(a) grants Bouchard the power to designate six "Founder Directors" for election to the Board,[10] and Section 1.2(b) grants each additional investor acquiring at least five million shares of common stock—defined as a "Lead Investor"—the power to designate a "Lead Investor Director."[11] This decision refers to Section 1.2(b)'s requirement that any Lead Investor own at least five million shares of common stock as the "Ownership Threshold."

Section 1.3 governs "Removal, Replacement and Vacancies on the Board."[12] Section 1.3(a) grants Bouchard and any Lead Investor the right to cause the removal of any of their directors designated pursuant to Section 1.2. It provides: "No party hereto shall vote (or act by written consent) to remove any member of the Board nominated in accordance with the aforesaid procedure, without cause, unless the person so designating such director as specified above so votes (or acts by written consent)."[13] Section 1.3(a) also requires that the stockholder signatories vote to remove the Founder Directors or the Lead Investor Directors at their designators'

---

[9] *Id.*

[10] *Id.* § 1.2(a).

[11] *Id.* § 1.2(b).

[12] *Id.* § 1.3.

[13] *Id.* § 1.3(a).

request.  It provides: "Each of the parties further covenants and agrees to vote (or act by written consent) to remove any director designated as set forth above upon the written request of any party or parties collectively entitled to designate such director."[14]

The Voting Agreement includes backstops to ensure the effectiveness of the parties' removal rights.  Under Section 7.1, Braidy agreed, "within the requirements of applicable law," to use its "best efforts to cause the nomination and election of directors as provided in [the Voting Agreement]."[15]  Under Section 7.2, the Secretary of the Company is authorized to serve as proxy for, and was granted an irrevocable power of attorney by, each stockholder who "(i) fails to vote or (ii) attempts to vote . . . in a manner which is inconsistent with the terms of [the Voting Agreement]."[16]  Section 7.2 "authorizes" the Secretary to vote all of such stockholder's shares "in favor of the election of persons as members of the Board determined pursuant to and in accordance with the terms and provisions of [the Voting Agreement]" or in accordance with several other enumerated provisions of

---

[14] *Id.*

[15] *Id.* § 7.1.

[16] *Id.* § 7.2.

6

the Voting Agreement, but it does not on its face automatically bind the Secretary, and no one signed the Voting Agreement in that capacity.[17]

When the Voting Agreement was executed, Bouchard designated himself and each of the Director Defendants as "Founder Directors" pursuant to Section 1.2(a), and they were elected to the Board accordingly. Because no stockholder qualified as a Lead Investor at that time, no Lead Investor Directors were designated or elected to the Board.

### B. The Board Removes Bouchard as CEO, Chairman, and Secretary.

On January 28, 2020, the Board held a special meeting telephonically (the "January 2020 Special Meeting"). At the January 2020 Special Meeting, the other members of the Board—the Director Defendants and non-party Norton Schwartz— voted to remove Bouchard as Secretary and appoint Preston to that position. They also voted to remove Bouchard from his roles as Chairman and CEO and appoint Price and non-party Tom Modrowski to those positions, respectively. The minutes of the January 2020 Special Meeting state that the Board "no longer believed that Mr. Bouchard would be successful" in raising capital for Braidy[18] and believed that

---

[17] *Id.*

[18] Bouchard Aff. Ex. C ("January 2020 Special Meeting Minutes") § 2.

7

Bouchard "did not have a viable path for financing of the Company or addressing its financial issues."[19]

The minutes of the January 2020 Special Meeting also state that Bouchard "strongly disagreed" with the Board's removal decisions.[20] He stated that the Board's decisions were "in contravention of the Voting Agreement of the stockholders" and that he had "the right under the Voting Agreement to remove directors."[21] According to the minutes, Preston stated that Bouchard "could kick all of the other members of the Board off of the Board in accordance with the terms of the Voting Agreement," but Preston believed the removal decision was consistent with his fiduciary obligations.[22] Price also expressed that he was "exercising his fiduciary duties" in removing Bouchard.[23]

Two days after the January 2020 Special Meeting, on January 30, 2020, the Company issued a press release thanking Bouchard for his "vision, energy, and dedication" and stating that Bouchard "will step down from his current position" but

---

[19] *Id.* § 3.

[20] *Id.* §§ 2, 3.

[21] *Id.* § 3.

[22] *Id.*

[23] *Id.*

8

"remain a [director]."[24]  Bouchard publicly responded that he had never agreed to step down.[25]

**C.  Bouchard Seeks to Exercise His Rights Under the Voting Agreement and Is Placed on Administrative Leave.**

On February 1, 2020, Bouchard sent each of the Board members a letter requesting their "immediate resignation" from the Board.[26]  He stated: "If you do not act honorably and do what is right for the company's shareholders, I will not hesitate to exercise my clear rights under the Voting Agreement and other corporate documents."[27]

Schwartz agreed to resign, and his resignation became effective on February 1, 2020.  The Director Defendants, however, refused.  On February 2, 2020, Price wrote a letter to Bouchard (the "February 2 Letter") in which he stated, on behalf of the Director Defendants: "[W]e decline your request to resign on the basis that the action you are requesting is not in the best interest of [Braidy] or the stockholders of [Braidy]."[28]  Price continued: "[W]e will remain as Directors absent an order from a Delaware Court determining that the provisions in the Agreement

---

[24] Compl. ¶ 28.

[25] *Id.*

[26] Bouchard Aff. Ex. D, at 7.

[27] *Id.*

[28] Bouchard Aff. Ex. E.

upon which you are relying are, under these circumstances, valid and enforceable under the law of the state of Delaware and not a violation of the directors' fiduciary duty to [Braidy] and its stockholders."[29]

The next day, on February 3, 2020, Price emailed Bouchard to notify him that he had been placed on "administrative leave."[30] The email explained that the Company had "identified certain financial and operational irregularities in connection with [Bouchard's] role as Chief Executive Officer that warrant investigation" and that the Company would advise Bouchard "of the results of the investigation as soon as they are available."[31] Such "financial and operational irregularities" were neither mentioned in the minutes of the January 2020 Special Meeting nor referenced in the February 2 Letter.[32]

On February 5, 2020, Bouchard sent a written request to the Director Defendants in their capacity as stockholders, as well as Defendants Hannah Management, LLC ("Hannah") and Commonwealth Seed Capital, LLC ("Commonwealth") demanding that they execute a Stockholder Action by Written

---

[29] *Id.*

[30] Bouchard Aff. Ex. H.

[31] *Id.*

[32] *See generally* January 2020 Special Meeting Minutes (lacking mention of "financial and operational irregularities" or anything of the like in connection with Bouchard's removal); February 2 Letter (same).

Consent to remove the Director Defendants in accordance with their obligations under Section 1.3(a) of the Voting Agreement.[33] The recipients neither executed the Stockholder Action by Written Consent nor otherwise voted to remove the Director Defendants.

On February 11, 2020, Bouchard sent a formal written request to Braidy asking that the Company "cause the Secretary of Braidy" to execute a written consent in order to "effectuate, effective immediately, the removal of the [Director Defendants] from the Board, as required by and in accordance with Sections 1.3(a), 7.1 and 7.2 of the Voting Agreement."[34] The Company did not do so.

### D. Bouchard Files This Lawsuit and the Board Launches an Investigation into Bouchard's Corporate Spending.

Bouchard filed his Verified Complaint (the "Complaint") on February 14, 2020.[35] The Complaint contains two causes of action claiming breach of the Voting Agreement.[36]

Count I alleges that the Director Defendants, Hannah, and Commonwealth breached Section 1.3(a) of the Voting Agreement. Because Count I is asserted

---

[33] Bouchard Aff. Ex. F, at 2.

[34] Bouchard Aff. Ex. G, at 1.

[35] Compl.

[36] For ease, this decision refers to each cause of action by "Count" number.

11

against these defendants in their capacity as stockholders, this decision refers to them collectively for the purpose of discussing Count I as the "Stockholder Defendants."[37]

Count II alleges that Braidy and Preston, in his capacity as Secretary, breached Sections 7.1 and 7.2 of the Voting Agreement.

Both Counts seek specific performance of the relevant provisions of the Voting Agreement. Bouchard also seeks a declaration that "each of the Defendants has breached the Voting Agreement" and an order "[e]njoining each of the Defendants from taking any actions in contravention of their contractual obligations under the Voting Agreement."[38]

Bouchard filed a motion to expedite proceedings contemporaneously with the Complaint, seeking a trial and resolution by March 13, 2020.[39]

Before the hearing on Bouchard's motion to expedite, the Stockholder Defendants moved to dismiss Count I for lack of personal jurisdiction,[40] and Preston

---

[37] On March 26, 2020, the parties stipulated to stay Commonwealth's obligation to participate in this litigation. Dkt. 60, Order Regarding Def. Commonwealth Seed Capital, LLC ¶ 1. For purposes of this decision only, therefore, Commonwealth is excluded from the definition of Stockholder Defendants.

[38] Compl. at 23–24.

[39] Dkt. 1, Mot. for Expedited Proceedings ¶ 21.

[40] Dkt. 17, Mot. to Dismiss Defs. John Preston, Charles Price, Michael Porter, Christopher Schuh and Hannah Management LLC ("Brief No. 1").

moved to dismiss Count II for lack of personal jurisdiction and failure to state a claim.[41]

During the hearing on the motion to expedite, the Court observed that motion practice could potentially winnow the disputes concerning: (1) jurisdiction over the Stockholder Defendants as to Count I and Preston as to Count II; (2) Bouchard's entitlement to specific performance of the Voting Agreement; and (3) the availability of Braidy's anticipated unclean hands defense as a matter of law. The Court set a hearing on these issues for April 8, 2020.

Braidy filed its Answer to Count II of the Complaint on March 4, 2020, asserting the affirmative defense of unclean hands.[42] In support of this defense, the Answer states that on February 17, 2020, a special committee of the Board (the "Special Committee") comprising the four Director Defendants had launched an investigation into "several 'red flags' concerning Bouchard's use of Braidy funds."[43]

---

[41] *Id.* The Stockholder Defendants and Preston also moved to dismiss Counts I and II, respectively, under Rule 12(b)(5) for insufficient service of process, but that motion is now moot. *See* Dkt. 44, Pl.'s Opening Br. in Supp. of Mot. for Summ. J., Mot. for J. on the Pleadings, and Opp'n to Moving Defs.' Mot. to Dismiss ("Brief No. 2"); Dkt. 39 (affidavits of service evidencing that service was effectuated on Schuh, Price, Preston, Porter, and Hannah).

[42] Dkt. 24, Def. Braidy Industries, Inc.'s Answer to Pl.'s Verified Compl. ("Answer").

[43] *Id.* at 32–33. The Special Committee was also charged with overseeing this litigation. Dkt. 64, Braidy Defs.' Reply Br. in Supp. of Their Mot. to Dismiss, and Answering Br. in Opp'n to Pl.'s Mot. for Summ. J. and Mot. for J. on the Pleadings ("Brief No. 3") Ex. C, at 1.

The Answer states that the Special Committee's investigation is "likely to prove self-dealing and other wrongful conduct by Bouchard" sufficient to "prevent Bouchard from obtaining the equitable relief requested against Braidy relating to the Voting Agreement."[44]

### E. The Director Defendants Take Action on March 18 Designed to Moot Plaintiff's Claims.

Through affidavits and briefs, the parties report that at a special meeting of the Board held on March 18, 2020 (the "March 18 Special Meeting"),[45] the Board adopted a number of resolutions.[46] Through these resolutions, the Board approved and resolved to submit to the stockholders for approval an amendment to Braidy's Certificate of Incorporation (the "Amendment") that would increase the number of authorized shares of Braidy common stock and effect a 1-to-13 forward split of Braidy common stock.[47]

---

[44] Answer at 33.

[45] Defendants represent that the March 18 Special Meeting was duly noticed and that a quorum was present. Brief No. 3 at 18. Plaintiff disputes these assertions. Dkt. 70, Pl.'s Reply in Supp. of his Mot. for Summ. J. and Mot for J. on the Pleadings ("Brief No. 4"), at 45. This decision does not resolve the issue.

[46] Dkt. 52, Aff. of Craig T. Bouchard Ex. A ("March 18 Resolutions"). Price, Schuh, and Preston voted in favor of the resolutions, and Bouchard voted against the resolutions. Porter did not participate in the March 18 Special Meeting.

[47] *Id.* at 1–2.

The Board next took actions that were made contingent on the effectiveness of the Amendment. The Board first voted to expand the number of Board seats from six to eighteen.[48] The Board then voted to amend the Company's bylaws "to provide that at any meeting of the Board, the greater of (i) a majority of the directors then in office and (ii) one-third of the entire Board shall constitute a quorum."[49]

The Board then took actions that were made contingent on the effectiveness of the Amendment *and* the expansion of the Board. The Director Defendants tendered their resignations as Founder Directors, but such resignations were "not to take effect until" the Amendment became effective and the size of the Board increased to eighteen.[50] The Board resolved to accept the Director Defendants' conditional resignations.[51] The Board then resolved to fill ten of the anticipated vacancies created by the board expansion.[52]

According to Defendants, on March 18, 2020, Braidy received written consents representing more than half of Braidy common stock.[53] The consenting

---

[48] *Id.* at 3.

[49] *Id.* at 5.

[50] *Id.* at 3.

[51] *Id.*

[52] *Id.* at 4.

[53] Brief No. 3 Ex. N; Brief No. 3 at 3, 21 (representing that Braidy received written consents representing approximately fifty-four percent of Braidy common stock).

15

stockholders purported to approve the Amendment,[54] ratify the filling of Board vacancies, and authorize the officers of Braidy to "take any and all actions" necessary to "carry out the purpose and intent of, or consummate the transactions contemplated by" those two resolutions.[55]

Before the events of March 18, no Braidy stockholder owned five million or more shares of Braidy common stock, meaning that there were no Lead Investors or Lead Investor Directors and that the Board comprised Bouchard's designees—the Founder Directors—exclusively. If the stock split was effective, then certain stockholders arguably met the Ownership Threshold requirement and became Lead Investors entitled to designate Lead Investor Directors.[56] The Director Defendants, purportedly no longer Founder Directors, were identified as four of the ten Lead Investor Directors purportedly appointed to the Board on March 18.[57]

According to Defendants, as of March 18, 2020, the Board comprised Bouchard, the four Director Defendants (now Lead Investor Directors), six non-

---

[54] Also on March 18, 2020, the Amendment was filed with the Delaware Secretary of State. Brief No. 3 Ex. O.

[55] Brief No. 3 Ex. N, at 1–2.

[56] Voting Agreement § 1.2(b).

[57] Dkt. 52, Pl.'s Br. in Supp. of Mot. for Entry of a TRO and/or Status Quo Order Ex. 1 (Defendants' counsel explaining in an email that the Director Defendants "resigned as Founder Directors" and were "elected as Lead Investor Directors"); Brief No. 3 at 24.

16

parties, and seven vacancies.[58]  Defendants represent that the vacancies included five Founder Directors, one Lead Investor Director to be designated by Bouchard, and one Lead Investor Director to be designated by Commonwealth.[59]  In an email dated March 18, 2020, Defendants expressed their belief that the events of the day "moot[ed] Mr. Bouchard's Delaware litigation, as pled."[60]

### F.    The Status Quo Order

Bouchard does not agree that the events of March 18 mooted his claims.  On March 19, 2020, Bouchard filed a Motion for a Temporary Restraining Order and/or Status Quo Order (the "Status Quo Motion").[61]  Through the Status Quo Motion, Bouchard sought an order restoring the Board that was in place before March 18 and restricting Defendants from effecting the changes they purported to make at the March 18 Special Meeting.

The next day, on March 20, 2020, the Court ruled that a status quo order was appropriate and that, pending resolution of this dispute, the Board would continue to comprise the individuals who served on the Board at the time Bouchard commenced this litigation—Bouchard, the Director Defendants, and one vacant seat for a total

---

[58] March 18 Resolutions at 4.

[59] Brief No. 3 at 24.

[60] Dkt. 52, Pl.'s Br. in Supp. of Mot. for Entry of a TRO and/or Status Quo Order Ex. 1.

[61] Dkt. 51, Mot. for Entry of a TRO and/or Status Quo Order ("TRO Mot.").

of six seats.[62]  The Court ordered the parties to meet and confer concerning the scope of restrictions to be imposed by the status quo order and requested that the parties brief the issue of whether the events of March 18 mooted the relief sought by Bouchard in this action.  On March 27, 2020, the Court entered the parties' stipulated form of status quo order (the "Status Quo Order").[63]

### G.    The Special Committee Report

On April 7, 2020, counsel for Defendants filed a letter on the docket attaching the Special Committee's "Report on Investigation Into Non-Financial Conduct for the Special Committee of the Board of Directors of Braidy Industries, Inc." (the "Special Committee Report").[64]  As its title suggests, the Special Committee Report did not address the "financial and operational irregularities" identified in the February 2 Letter or the "'red flags' concerning Bouchard's use of Braidy funds" that serve as the basis for Braidy's unclean hands defense.[65]  Rather, the Special Committee Report made several other conclusions, including that there existed "a

---

[62] Dkt. 81, Telephonic Oral Arg. and Rulings of the Ct. on Pl.'s Mot. for a TRO or a Status Quo Order.

[63] Dkt. 63, Stipulated Temporary Restraining and/or Status Quo Order.

[64] Dkt. 74, Report on Investigation Into Non-Financial Conduct for the Special Committee of the Board of Directors of Braidy Industries, Inc. Ex. 1.

[65] The Special Committee Report explains that the "evaluation of financial matters," including "an internal review of Mr. Bouchard's financial expenses and transactions," was "not the subject of this Report." *Id.* at 1.

general loss of faith" in Bouchard, that Bouchard furnished inaccurate information to the Board or withheld information from the Board, that Bouchard disregarded the roles of other Board members, and that Bouchard caused certain emails to be deleted from Braidy's system.[66]

## H. The Pending Motions

As discussed above, on February 24, 2020, the Stockholder Defendants filed a motion to dismiss Count I pursuant to Rule 12(b)(2) for lack of personal jurisdiction, and Preston moved to dismiss Count II against him pursuant to Rules 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to state a claim.

On March 13, 2020, Bouchard moved for summary judgment pursuant to Rule 56 on the entirety of his claims—specific performance of the Voting Agreement, declaratory judgment that the Voting Agreement has been breached, and an order enjoining future breaches—and for judgment on the pleadings pursuant to Rule 12(c) on Braidy's unclean hands defense.[67]

Defendants raise a mootness defense to Bouchard's motion for summary judgment, arguing that the Board actions of March 18 mooted Bouchard's requests

---

[66] *Id.* at 3.

[67] Dkt. 44, Pl.'s Mot. for Summ. J. and Mot. for J. on the Pleadings.

for specific performance. In response to Defendants' mootness argument, Bouchard contends that his claims for breach of the Voting Agreement require that the Board actions of March 18 be set aside.[68]

Briefing on the three motions and Defendants' mootness argument proceeded on a combined basis and was completed by April 3, 2020.[69] The Court heard oral arguments on the issues on April 8, 2020.[70]

## II. LEGAL ANALYSIS

The parties' motions require the Court to resolve the following four issues: whether the Court has personal jurisdiction over the Stockholder Defendants as to Count I; whether the Court has personal jurisdiction over Preston as to Count II; whether Bouchard is entitled to judgment on the pleadings on Braidy's unclean hands defense; and whether the Board actions of March 18 moot any portion of Bouchard's motion for summary judgment, and if not, whether Bouchard is entitled to summary judgment on his claims.

---

[68] Brief No. 4 at 26–47.

[69] *See* Brief No. 1; Brief No. 2, Brief No. 3; Brief No. 4; Dkt. 71, Braidy Defs.' Sur-Reply Br. Concerning Mootness ("Brief No. 5").

[70] Dkt. 87, Telephonic Oral Arg. on Defs.' Mot. to Dismiss, Pl.'s Mot. for Summ. J., and Pl.'s Mot. for J. on the Pleadings.

## A. The Stockholder Defendants Are Dismissed as to Count I for Lack of Personal Jurisdiction.

"When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[71] In ruling on a 12(b)(2) motion, this Court may "consider the pleadings, affidavits and any discovery of record."[72] "If, as here, no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'"[73]

Generally, Delaware courts resolve questions of jurisdiction using a two-step analysis,[74] first determining "that service of process is authorized by statute,"[75] and next determining that the defendant had certain minimum contacts with Delaware

---

[71] *Ryan*, 935 A.2d at 265 (citing *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318 (Del. Ch. 2003)).

[72] *Id.* (citing *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[73] *Id.* (first citing *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996) and then quoting *Cornerstone Techs.*, 2003 WL 1787959, at *3).

[74] *Id.*

[75] *Id.*

such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[76]

Where the defendant has consented to jurisdiction, however, both aspects of the jurisdictional analysis are deemed satisfied.[77] "Because the defense of lack of personal jurisdiction is a personal right, 'it may be obviated by consent or otherwise waived.'"[78] And while it is true that "the personal jurisdiction requirement is a waivable right,"[79] "[i]ntention forms the foundation of the doctrine of waiver, and it must clearly appear from the evidence."[80] "A waiver may be express or implied, but either way, it must be unequivocal."[81] "An express waiver exists where it is clear from the language used that the party is intentionally renouncing a right that it is

---

[76] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[77] *Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008) (observing that "an express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process," thus eliminating the need to undertake a minimum contacts analysis" (citing *Sternberg v. O'Neil*, 550 A.2d 1105, 1116 (Del. 1988), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016))); *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1132 (Del. Ch. 2008) (observing that "[a] party may expressly consent to jurisdiction by contract").

[78] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *6 (Del. Ch. July 14, 2008) (internal quotation marks and citations omitted).

[79] *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *10 (Del. Ch. Mar. 15, 2019) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985)); *see id.* at *10 n.5, n.6 (collecting authorities).

[80] *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224 (Del. 1975).

[81] *Dirienzo v. Steel P'rs Hldgs., L.P.*, 2009 WL 4652944, at * 4 (Del. Ch. Dec. 8, 2009).

aware of."[82] An implied waiver is only possible if there is a "clear, unequivocal, and decisive act of the party demonstrating relinquishment of the right."[83]

In this case, Plaintiff does not rely on any statute authorizing the exercise of personal jurisdiction over the Stockholder Defendants.[84] Plaintiff instead argues that each of the Stockholder Defendants consented to jurisdiction under Section 7.3 of the Voting Agreement. Titled "Specific Enforcement," Section 7.3 provides in its entirety:

> Each party acknowledges and agrees that each party hereto will be irreparably damaged in the event any of the provisions of this Agreement are not performed by the parties in accordance with their specific terms or are otherwise breached. Accordingly, it is agreed that each of the Company and the Stockholders shall be entitled to an injunction to prevent breaches of this Agreement, and to specific enforcement of this Agreement and its terms and provisions *in any action instituted in any court of the United States or any state having subject matter jurisdiction*.[85]

Focusing on the emphasized language, Plaintiff argues that the parties intended to waive jurisdictional defenses to any action brought in "any court of the

---

[82] *Id.*

[83] *Id.* at *5.

[84] Plaintiff does not argue that Price, Porter, or Schuh are subject to jurisdiction under 10 *Del. C.* § 3114(a). Nor does Plaintiff argue that 10 *Del. C.* § 3104(c)(1) provides a basis for personal jurisdiction over the Stockholder Defendants.

[85] Voting Agreement § 7.3 (emphasis added).

23

United States or any state."[86] Put differently, Plaintiff argues that the Stockholder Defendants consented to be sued for breach of the Voting Agreement anywhere in the world with subject matter jurisdiction to hear the dispute.

Delaware courts follow the objective theory of contracts, construing the contract the way it "would be understood by an objective, reasonable third party."[87] In practice, the objective theory of contracts requires that a court "interpret clear and unambiguous terms according to their ordinary meaning."[88] "In so doing, the court evaluates the relevant provision's semantics, syntax, and context, aided by interpretive canons."[89] As the whole-text canon instructs, context is the primary determinant of meaning.[90] Thus, the entirety of Section 7.3, rather than the single phrase Bouchard emphasizes, informs its intended meaning.

---

[86] Brief No. 2 at 57.

[87] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019).

[88] *Id.* (internal quotation marks and citations omitted).

[89] *JJS, LTD. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *5 (Del. Ch. Oct. 11, 2019).

[90] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913–14 (Del. 2017); *see also E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."); *id.* at 1114 (noting that it is a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions"); *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *10 (Del. Ch. Sept. 11, 2015) ("Delaware courts . . . construe agreements as a whole and give meaning to all provisions.").

Read as a whole, Section 7.3 must be construed as a consent to certain equitable remedies. The first sentence of Section 7.3 memorializes the parties' agreement that irreparable damage would result from breach of the Voting Agreement.[91] The second sentence of Section 7.3 memorializes the parties' agreement that, in the event of such breach, the parties shall be entitled to certain equitable remedies.[92] A transitional word—"[a]ccordingly," which means "correspondingly" or "consequently, so"[93]—links the two sentences, indicating that the latter concept flows from the former. In other words, because the parties agreed in the first sentence that irreparable damage would flow from breach, they consequently stipulated in the second sentence to certain equitable remedies.

Reading Section 7.3 as a consent to equitable remedies is consistent with the way commentators have interpreted similar provisions.[94] This reading is further

---

[91] Voting Agreement § 7.3.

[92] *Id.*

[93] *Accordingly*, Merriam-Webster, https://www.merriam-webster.com/dictionary/accordingly (last visited April 27, 2020).

[94] In commenting on a similar provision in its annotated model merger agreement, the Merger and Acquisitions Committee of the American Bar Association noted that "[t]he waiver of the defense of an adequate remedy at law makes an action in equity more likely to be successful, as the waiver removes a key defense to the request for equitable relief." ABA Mergers and Acquisitions Committee, Model Merger Agreement for the Acquisition of a Public Company 314 (2011); *see also id.* (observing that "expressly providing for equitable remedies will not insure that the parties will be successful in obtaining the requested relief from a court sitting in equity, but the acknowledgement of their right to

bolstered, albeit to a lesser degree, by the observation that drafters often address the remedies to which contracting parties have agreed—such as liquidated damages or specific performance—separate and apart from their chosen forum for dispute resolution.[95]

It would be unreasonable to construe Section 7.3 as creating a consent to personal jurisdiction. The primary purpose of the provision is to create a consent to equitable remedies. To achieve that primary, it is unnecessary for the parties to consent to be sued in any forum in the world having subject matter jurisdiction over the dispute. It would be unreasonable and absurd to construe the last adverbial phrase of Section 7.3 in that manner.[96] Read properly, the last adverbial phrase modifies the language preceding it such that the parties "shall be entitled" to certain equitable remedies only in actions instituted in a court with the power to grant

---

equitable relief may be persuasive to a court that is considering the matter" (citing *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *10, *11 n.34 (Del. Ch. June 5, 2006)).

[95] *Compare id.* § 8.14 (titled "Enforcement of Agreement" and described as a consent "to certain equitable remedies"), *with id.* § 8.7 (titled "Exclusive Jurisdiction; Venue" and setting forth a waiver of jurisdictional defenses); *see also* Jeff C. Dodd, Raymond T. Nimmer, Robert A. Feldman, Drafting Effective Contracts: A Practitioner's Guide §§ 2.07[D], 5.06[3], 2.11[A], 5.10[5] (3d ed. 2019) (addressing contractual risk allocation provisions authorizing liquidated damages or specific performance separately from boilerplate "forum selection" provisions).

[96] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (describing the absurdity canon).

equitable relief.  Section 7.3 does not provide a basis for this Court's jurisdiction over the Stockholder Defendants.

Plaintiff next argues that the Director Defendants waived their personal jurisdiction defense through their pre-litigation conduct.  Specifically, Plaintiff points to the February 2 Letter in which Price, on behalf of the five directors who voted to remove Bouchard, stated that the Director Defendants would "remain as Directors *absent an order from a Delaware Court* determining that the provisions in the Agreement upon which you are relying are, under these circumstances, valid and enforceable under the law of the state of Delaware."[97]

The Director Defendants neither expressly nor impliedly waived their jurisdictional defenses in the February 2 Letter.  The language upon which Plaintiff relies in the February 2 Letter, on its face, falls short of unequivocally relinquishing the right to contest a Delaware court's personal jurisdiction.  The February 2 Letter lacks any reference to "jurisdiction."  Mere reference to an "order from a Delaware Court" cannot be said to evince the sort of intentional renouncement required by the doctrine of waiver under Delaware law.

Plaintiff cites to three decisions in support of a contrary conclusion.

---

[97] Bouchard Aff. Ex. E (emphasis added).

27

In *Salud Natural Entrepreneur, Inc. v. Nutricento Internacional, Inc.*, the court found that one of the defendants waived its personal jurisdiction defense where "the sum total of [its] actions in [the] litigation constituted submission by conduct."[98] The "sum total" of the defendant's conduct included filing its answer and counterclaim "with no mention of jurisdictional deficiencies," participating in the Rule 26(f) discovery conference and jointly submitting the report of that conference, and "sitting on the sidelines" while its co-defendants settled the claims against them.[99] The court observed that in light of this conduct, by the time the defendant filed its motion to dismiss for lack of personal jurisdiction, the plaintiff had "built up a reasonable expectation" that the defendant would defend the suit in the plaintiff's chosen forum.[100]

In *MacCauley v. Wahlig*, the plaintiff alleged that in a phone call with the defendants' counsel after the lawsuit was filed, the defendants' counsel "stated that there were no pending jurisdictional issues."[101] The court observed that, were it truly the case that the defendants represented to the plaintiff "that there were no jurisdictional issues," then the defendants "would have waived objections to

---

[98] 2011 WL 290271, at *3 (N.D. Ill. Jan. 27, 2011).

[99] *Id.*

[100] *Id.* (internal quotation marks omitted).

[101] 130 F.R.D. 302, 304 (D. Del. 1990).

personal jurisdiction."[102]  The court went on to explain, however, that it was in fact unreasonable for the plaintiff to believe that the defendants waived their jurisdictional defenses, since the defendants had previously "unequivocally, and in writing, stated that they would *not* waive objections to personal jurisdiction" until certain events transpired.[103]

In *Prince Manufacturing, Inc. v. Bard International Associates, Inc.*, the plaintiff "entered into a settlement negotiation with [the defendant]" prior to filing the lawsuit "on the condition that [the defendant] was 'not to object to jurisdiction and venue.'"[104]  The negotiation failed, the lawsuit was filed, and the defendant filed a motion to dismiss for lack of personal jurisdiction.[105]  The defendant conceded that its prior communications with the plaintiff constituted a "waiver of its personal jurisdiction defense," but argued instead that such waiver was conditioned on the plaintiff's unfulfilled promise to negotiate in good faith.[106]  The court rejected this assertion, finding that the defendant's claim of bad faith was unsupported by the record, and holding that the defendant's waiver remained effective.[107]

---

[102] *Id.*

[103] *Id.* at 305 (emphasis added).

[104] 1988 WL 142407, at *1 (D.N.J. Dec. 22, 1988) (quoting a letter authored by counsel).

[105] *Id.*

[106] *Id.*

[107] *Id.*

In this case, Plaintiff does not assert that the sum total of the Director Defendants' conduct amounted to waiver by conduct, as the plaintiff did in *Salud*. Nor does Plaintiff assert that the Director Defendants expressly stated that there would be "no jurisdictional issues" or something of the like, as the plaintiff did in *MacCauley*. And the Director Defendants do *not* concede that the February 2 Letter was a conditional waiver (or a waiver in any sense) of their personal jurisdiction defense, as the defendant did in *Prince*. The case law to which Plaintiff cites, therefore, does not support a finding that the Stockholder Defendants waived their personal jurisdiction defenses through the February 2 Letter.

In sum, Plaintiff has not demonstrated that the Stockholder Defendants consented to jurisdiction under Section 7.3 or waived their personal jurisdiction defense in the February 2 Letter. And because Plaintiff has identified no statutory basis for jurisdiction over the Stockholder Defendants, Plaintiff has not made the requisite *prima facie* jurisdictional showing for Count I as to Preston, Porter, Schuh, Price, and Hannah.

### B. Preston is Dismissed as to Count II for Lack of Personal Jurisdiction.

As to Count II against Preston, Plaintiff relies on Delaware's director consent statute codified at 10 *Del. C.* § 3114(a). The Delaware Supreme Court has held that Section 3114(a) broadly authorizes personal jurisdiction over nonresident fiduciaries if the claims "involve conduct by the nonresident fiduciary using his corporate

30

power."[108]  Whether Count II implicates Preston's corporate powers for personal jurisdiction purposes turns on whether Count II states a claim against Preston as Secretary.  Preston's Rule 12(b)(2) argument thus collapses into those he advances in support of his Rule 12(b)(6) motion.

Under Rule 12(b)(6), the Court may grant a motion to dismiss if the complaint "fail[s] to state a claim upon which relief can be granted."[109]  "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[110]  When considering such a motion, the Court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[111]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[112]

---

[108] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 289 (Del. 2016).

[109] Ct. Ch. R. 12(b)(6).

[110] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[111] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[112] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

Preston primarily argues that Section 7.2 gives the Secretary the mere authority to act without imposing the obligation to do so. Section 7.2 provides as follows:

> Irrevocable Proxy and Power of Attorney. Each party to this Agreement hereby constitutes and appoints as the proxies of the party and hereby grants a power of attorney to the then-Secretary of the Company . . . , with respect to the matters set forth in this Agreement, and hereby authorizes each of them to represent and to vote, if and only if the party (i) fails to vote or (ii) attempts to vote (whether by proxy, in person or by written consent), in a manner which is inconsistent with the terms of this Agreement, all of such party's Shares in favor of the election of persons as members of the Board determined pursuant to and in accordance with the terms and provisions of this Agreement . . . .[113]

Preston's interpretation of Section 7.2 is correct. The language of Section 7.2 appoints an agent of the Company—the Secretary—as the proxy of each stockholder signatory to the Voting Agreement. In doing so, Section 7.2 grants the Secretary a proxy that "authorizes" the Secretary to vote in a specified manner in the event the stockholder signatories fail to vote or attempt to vote in a manner inconsistent with their obligations under the Voting Agreement. Section 7.2 contains no obligatory language that could be read to obligate the person holding the position of Secretary to exercise the authority granted by Section 7.2.

---

[113] Voting Agreement § 7.2.

Best understood and read in tandem,[114] the backstops in Sections 7.1 and 7.2 impose an obligation on Braidy to cause whomever holds the position of Secretary to exercise his proxy in accordance with the Voting Agreement. Section 7.1 provides: "*The Company* agrees to use its best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement."[115] The onus is thus on Braidy, pursuant to Section 7.1, to "use its best efforts" to cause its Secretary to vote the shares over which the Secretary has been granted a power of attorney in accordance with "the rights granted under [the Voting Agreement]."[116] Bouchard's own written demand on Braidy to "cause the Secretary of Braidy" to act in accordance with the Voting Agreement is consistent with this interpretation.[117]

Because Section 7.2 does not impose an obligation on Preston to act in his capacity as Secretary, Count II does not implicate Preston's corporate powers for personal jurisdiction purposes. Count II is thus dismissed as to Preston.

---

[114] *See E.I. du Pont*, 498 A.2d at 114 (noting that it is a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions").

[115] Voting Agreement § 7.1 (emphasis added).

[116] *Id.*

[117] Bouchard Aff. Ex. G, at 1.

## C. Plaintiff Is Entitled to Judgment on the Pleadings on the Affirmative Defense of Unclean Hands.

Under Rule 12(c), a motion for judgment on the pleadings may be granted where "no material issue of fact exists and the movant is entitled to judgment as a matter of law."[118] In deciding a Rule 12(c) motion, "a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[119] However, a "court need not blindly accept as true all allegations, nor must it draw all inferences from them in [the non-moving party's] favor unless they are reasonable inferences."[120]

Plaintiff has moved for judgment on the pleadings on Braidy's affirmative defense of unclean hands, arguing that the defense is inapplicable as a matter of law. "The doctrine of unclean hands is '[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of [a] transaction at issue must be denied equitable relief . . . ."[121] In other words, "the Court refuses to consider requests for

---

[118] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[119] *Id.*

[120] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999) (internal quotation omitted), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[121] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 875–76 (Del. 2015) (quoting *McKennon v. Nashville Banner Publ'g Co.*, 512 U.S. 352, 360 (1995)).

34

equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals."[122]

"[T]here are a number of limitations on the application of the [unclean hands] maxim."[123] Relevant to this dispute, "in order for the doctrine to apply in the first place the improper conduct must relate directly to the underlying litigation."[124] This Court's jurisprudence requires that the improper conduct of which the litigant is accused bear an "'immediate and necessary' relation to the claims under which relief is sought."[125] Delaware courts "do not deny relief in equity to a plaintiff simply because the plaintiff may have engaged in inequitable conduct in the past."[126] Also, generally, "[t]he Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands."[127]

---

[122] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998).

[123] *Id.* at 523.

[124] *Id.*

[125] *Id.* (quoting *Kousi v. Sugahara*, 1991 WL 248408, at *2 (Del. Ch. Nov. 21, 1991)); *see E. States Petroleum Co. v. Universal Oil Prods. Co.*, 8 A.2d 80, 82 (1939) ("[C]ourts of equity . . . apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks . . . .").

[126] *Kousi*, 1991 WL 248408, at *2.

[127] *RBC*, 129 A.3d at 876 (quoting *SmithKline Beecham Pharms. Co. v. Merck & Co.*, 766 A.2d 442, 448 (Del. 2000)).

In this case, Braidy's unclean hands defense does not bear an immediate and necessary relation to Bouchard's claims for breach of contract. Through the Complaint, Plaintiff seeks to vindicate his contractual rights as a stockholder under the Voting Agreement and compel Braidy's compliance with its contractual obligations. By contrast, Braidy's unclean hands defense relates to Bouchard's alleged misuse of company funds, self-dealing, or other wrongful acts.[128] Even accepting these allegations as true, they relate to Bouchard's fiduciary duties as a director and officer. They do not bear an immediate and necessary relation to Bouchard's rights under the Voting Agreement or to Braidy's obligations under the Voting Agreement. Therefore, there exists "no close nexus between the wrongdoing

---

[128] Answer at 32–33 (listing examples of Bouchard's alleged misconduct including "Personal expenses charged by or on behalf of Bouchard to Braidy's American Express credit cards, in violation of Braidy's travel policies (which prohibit personal charges); At least ~$220,000 in unsubstantiated travel charges, and at least ~$113,000 in unsubstantiated meal charges to Braidy's American Express credit cards; Unauthorized charges associated with chartered private planes, in violation of Braidy's travel policies; Legal work conducted on behalf of Bouchard but billed to Braidy; Bonuses paid to Bouchard, at Bouchard's own direction, that Braidy believes violate his employment agreement; and 'Related party' transactions involving businesses associated with Bouchard's son and brother-in-law"); *id.* at 33 (alleging that the Special Committee investigation is "likely to prove self-dealing and other wrongful conduct by Bouchard" sufficient to "prevent Bouchard from obtaining the equitable relief requested against Braidy relating to the Voting Agreement").

of the plaintiff and the relief he seeks"[129] and Braidy's unclean hands defense fails as a matter of law.

This conclusion finds support in *In re Farm Industries, Inc.*,[130] a decision of this Court. In that case, a stockholder owning a majority of the outstanding Class A and Class B common stock in a Delaware corporation filed a lawsuit against "certain officers and directors" in order to compel an annual meeting and election of directors.[131] The defendants responded that, through a series of voting agreements to which plaintiff was a party, Class B stockholders were entitled to elect a majority of the directors at the annual meeting and one of the defendants—the company's president—had the authority to vote the majority of the Class B shares either by irrevocable proxy or as voting trustee.[132] The defendants sought specific performance of the plaintiff's obligations under the voting agreements.[133]

The plaintiff replied that the company's president had engaged in self-dealing such that he "misuse[d] . . . the position of dominance and control given him by the

---

[129] *Claros Diagnostics, Inc. S'holders Representative Comm. v. OPKO Health, Inc.*, 2020 WL 829361, at *13 (Del. Ch. Feb. 19, 2020).

[130] 196 A.2d 582 (Del. Ch. 1963).

[131] *Id.* at 583–84.

[132] *Id.* at 584, 585.

[133] *Id.* at 584.

37

agreements in issue."[134]  This, the plaintiff asserted, was sufficient ground for the

court to deny the equitable relief the defendants sought.[135]  But the Court disagreed.

Citing the doctrine of unclean hands, the Court explained that the claim of self-

dealing did not bear a sufficient relationship to the claim for specific performance of

the voting agreements:

> Since none of the claims with which we are now
> concerned have any relation to the formation of the
> agreements in issue or to purported breaches thereof, . . .
> that doctrine may not be invoked so as to deny relief.  That
> is not to say of course that [the plaintiff] may not otherwise
> assert these claims as the basis of an independent action
> against the defendants, if so desired.[136]

In this case, like the proponent of the unclean hands doctrine in *Farm

Industries*, Braidy asserts that Bouchard may have engaged in "self-dealing and

other wrongful conduct" in his capacity as fiduciary such that he is not entitled to

specific performance of the Voting Agreement.[137]  And just as the Court in *Farm

Industries* rejected that argument, so too must this one.  Braidy does not assert that

Bouchard's alleged "self-dealing and other wrongful conduct" somehow affected

---

[134] *Id.* at 590.

[135] *Id.*

[136] *Id.*

[137] Answer at 32–33.

the formation of the Voting Agreement or otherwise relates to Bouchard's claims for breach of the Voting Agreement.[138]

Braidy urges the Court to permit it to develop a factual record concerning the defense of unclean hands, citing to cases where this Court has done so.[139] Yet a defendant cannot avoid judgment on the pleadings by inserting the words "unclean hands" into its answer and subsequently demanding a "full record" without identifying the immediate and necessary relation between the alleged wrongful acts and the underlying claim in the litigation.[140]

---

[138] Further, the alleged wrongdoing that forms the basis for Braidy's unclean hands defense resembles a claim for breach of fiduciary duty and is best evaluated under that legal framework. *See Farm Indus.*, 196 A.2d at 590 (rejecting the defense of unclean hands but noting that its proponent may still "assert these claims as the basis of an independent action"); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1521371, at *4 (Del. Ch. Sept. 27, 2000) (finding that the unclean hands defense "is not necessary to protect the defendants from any harm they have suffered as a result of [plaintiff's] wrongful conduct").

[139] Brief No. 3 at 59–60 (citing *Claros Diagnostics*, 2020 WL 829361, at *13; *Xu Jong Bin v. Heckmann Corp.*, 2009 WL 3440004, at *13 (Del. Ch. Oct. 26, 2009)).

[140] In the cases to which Braidy cites, the defendants alleged that the contractual obligations the plaintiffs sought to enforce arose by virtue of fraudulent conduct, thereby indicating, at the least, that an immediate and necessary relation between the plaintiffs' misconduct and the underlying claims in the litigation may exist. *Claros Diagnostics*, 2020 WL 829361, at *13 (allowing an unclean hands defense to proceed based on "the allegation . . . that the contractual obligations the [plaintiff] [sought] to enforce *arose via fraud*" (emphasis added)); *Xu Jong Bin*, 2009 WL 3440004, at *13 (denying a motion for judgment on the pleadings concerning a variety of affirmative defenses asserted in response to a claim for specific performance of a contract, including *fraudulent inducement*, *lack of authority to enter into the contract*, *use of a false identity when signing the contract*, and unclean hands).

In sum, Braidy's affirmative defense of unclean hands does not bear an immediate and necessary relation to Bouchard's claims for breach of the Voting Agreement. Plaintiff's motion for judgment on the pleadings is granted.

## D.    Plaintiff's Motion for Summary Judgment Is Denied.

Court of Chancery Rule 56 provides that summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[141] A party is entitled to judgment as a matter of law "where there are no material factual disputes."[142] "If, however, there are material factual disputes, that is, if the parties are in disagreement concerning the factual predicate for the legal principles they advance, summary judgment is not warranted."[143] "In discharging this function, the court must view the evidence in the light most favorable to the non-moving party."[144]

Through Count II, Bouchard seeks an injunction requiring the Company to cause the removal of the Director Defendants from the Board. Defendants contend that because Bouchard's contractual right to remove directors was limited to Founder Directors, the March 18 resignations of the Director Defendants as Founder

---

[141] Ct. Ch. R. 56(c).

[142] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992) (citing *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)).

[143] *Id.*

[144] *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Directors mooted Bouchard's request for specific performance of the Voting Agreement.[145]

Defendants' interpretation of the Voting Agreement is correct. Although Bouchard seeks the "immediate removal of" the Director Defendants from the Board without regard to the mechanism by which they were designated,[146] the Voting Agreement limits Plaintiff's removal rights to the removal of directors that he is "entitled to designate."[147] Because the Voting Agreement limits Bouchard's designation rights to the designation of Founder Directors, his removal rights are similarly limited to the removal of Founder Directors.[148] Thus, if the Director Defendants resigned from their positions as Founder Directors, then Bouchard's right to remove them from that position is moot.

The problem with Defendants' mootness argument is that the Director Defendants' resignations were "not to take effect" until the Amendment became

---

[145] Brief No. 3 at 24. "According to the mootness doctrine, although there may have been a justiciable controversy at the time the litigation was commenced, the action will be dismissed if that controversy ceases to exist." *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 823 (Del. 1997). Because this Court "generally does not provide advisory opinions," *Glazer v. Pasternak*, 693 A.2d 319, 320 (Del. 1997), dismissal under the mootness doctrine is appropriate if the Court "can no longer grant relief in the matter." *State Farm Mut. Auto. Ins. Co. v. Davis*, 80 A.3d 628, 632 (Del. 2013).

[146] Compl. Prayer for Relief ¶¶ b, c.

[147] Voting Agreement § 1.3(a).

[148] *Id.* § 1.2(a).

41

effective.[149]  Their resignations were also "not to take effect" until the size of the Board increased to eighteen—an event that was to occur also "only if, and upon such time as, the Amendment bec[ame] effective."[150]  Put simply, if the Amendment were to be deemed ineffective, so too would the resignations of the Director Defendants. And if the resignations of the Director Defendants were ineffective, then Bouchard's contractual right to remove them survived the events of March 18.

Each side of this litigation has raised a bloody onslaught of arguments concerning the effectiveness of the March 18 actions.[151]  Some arguments raise disputed facts.  Some raise creative or complicated legal theories warranting further development.  In no event do these actions easily lend themselves to judicial review on summary judgment.

Under Delaware law, "[t]here is no 'right' to a summary judgment."[152]  And summary judgment will not be granted "if, upon an examination of all the facts, it seems desirable to inquire thoroughly into them in order to clarify the application of the law to the circumstances."[153]  In this case, further development of the factual

---

[149] March 18 Resolutions at 3.

[150] *Id.*

[151] *See generally*, Dkt. 89, Letter to Counsel.

[152] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002); *see Cross v. Hair*, 258 A.2d 277, 278 (Del. 1969) ("Under the rule now well established in this jurisdiction, there is no 'right' to a summary judgment.").

[153] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

42

record and the parties' legal arguments would help clarify the application of the law to the circumstances of the case.

## III. CONCLUSION

For the foregoing reasons, the claims against Defendants John Preston, Charles Price, Michael Porter, Christopher Schuh, and Hannah Management LLC are DISMISSED for lack of personal jurisdiction. Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) is GRANTED. Plaintiff's motion for summary judgment is DENIED.